UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                           |   |                                      |
|---------------------------|---|--------------------------------------|
| UNITED STATES OF AMERICA, | * |                                      |
| v.                        | * | Criminal Action No. 18-cr-10022-ADB  |
| JAMIE FIGUEROA.           | * |                                      |

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS**

BURROUGHS, D.J.

On January 25, 2018, a grand jury returned an indictment charging Jamie Figueroa ("Figueroa") with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). [ECF No. 1]. Currently pending before the Court is Figueroa's motion to suppress evidence obtained by police when he was stopped on January 9, 2018. [ECF No. 78]. For the reasons set forth below, the motion to suppress [ECF No. 78] is DENIED.

I. **BACKGROUND**

The following facts are drawn from the arrest report, [ECF No. 78-1 ("Arrest Report")], prepared by Trooper Keith Ledin ("Ledin"), as well as the motion hearing held on October 4, 2019. At that hearing, the Court heard testimony from Ledin and Trooper Paul Dunderdale ("Dunderdale"). The parties also submitted images and a map of the area, [Exs. 2, 3, 4, 5], and security footage of the stop, [Ex. 6 ("Footage")].[1]

On January 9, 2018, Massachusetts State Police Sergeant Frank Walls, Ledin, and Dunderdale, all of whom were members of the South Eastern Massachusetts Gang Task Force,

---

[1] "Ex." refers to exhibits presented at the October 4, 2019 hearing.

were patrolling a high crime area in Fall River, Massachusetts, in an unmarked police cruiser. [Arrest Report at 2]. At approximately 1:30 p.m., the officers noticed a black Cadillac SUV that stopped in the street and held up traffic. [Id.]. The officers ran a registration check and determined that the car was registered to an older white male from Georgetown, Massachusetts. [Id.]. Because the car had interfered with traffic and neither the driver nor passenger[2] matched the description of the registered owner, the officers began to follow the SUV. [Id.]. While maneuvering their cruiser, the officers briefly lost sight of the vehicle. [Id.; Hearing Tr. at 30:2–11]. When they saw the SUV again a few minutes later, it was moving slowly and the driver was on his phone and looking around. [Arrest Report at 2–3; Footage]. The passenger was no longer in the vehicle. [Arrest Report at 3].

The officers continued to monitor the SUV, which pulled into the parking lot of a Country Farms convenience store. [Id.]. The driver got out of the SUV and looked inside the trunk. [Id.; Footage]. He then exited the parking lot on foot, leaving the vehicle in the parking lot, and walked to a house down the street. [Arrest Report at 3; Footage]. The officers moved their patrol car to the Country Farms parking lot. [Arrest Report at 3].

At this time, the officers regained sight of the passenger, whom they had not seen since they first started following the SUV. The passenger entered the Country Farms parking lot on foot with Figueroa. [Id.; Footage]. After speaking briefly with Figueroa, the passenger left him in the parking lot and walked to the same house that the driver had entered previously. [Arrest Report at 3; Footage]. The officers observed the passenger pacing back and forth on the house's porch until the driver exited the house and met him. [Arrest Report at 3; Hearing Tr. at 35:11–40:19]. Figueroa remained at the Country Farms parking lot, where officers observed him

---

[2] For the sake of clarity, this Memorandum and Order will refer to these individuals as "driver" and "passenger," even when referring to moments when they were not present in the vehicle.

2

checking his phone and repeatedly entering and exiting the store without purchasing anything. [Arrest Report at 3; Hearing Tr. at 12:5–7]. The officers thought that both the passenger and Figueroa were acting anxious or nervous. [Arrest Report at 3]. To avoid Figueroa suspecting that he was being surveilled, the officers moved their cruiser to a driveway across the street, which provided a clear view of the parking lot and Figueroa. [Arrest Report].

A few minutes later, the driver and passenger walked back to the Country Farms parking lot from the house. [Arrest Report at 3; Hearing Tr. at 40:20–41:10]. When they entered the parking lot, Figueroa walked towards the SUV. [Arrest Report at 3; Hearing Tr. at 42:15–44:10; Footage]. Figueroa did not greet the driver, whom he had not previously been seen interacting with, and did not acknowledge the passenger. [Hearing Tr. at 12:18–13:9; Footage]. The driver and passenger returned to their seats in the SUV, and Figueroa got in the back seat. [Arrest Report at 3; Hearing Tr. at 13:13–22, 44:11–16; Footage].

The officers thought that the parties might be engaging in a drug deal. [Arrest Report at 3; Hearing Tr. at 44:17–45:6]. Trooper Ledin noticed that the driver and passenger had their bodies turned towards Figueroa in the SUV, as though in conversation. [Arrest Report at 4; Hearing Tr. at 66:12–22]. The officers pulled into the parking lot and positioned their cruiser behind the SUV. [Footage]. As the officers opened the doors of the cruiser, Figueroa opened the door to the SUV and started to exit the vehicle. [Hearing Tr. at 14:16–15:18, 55:4–9; Footage]. Figueroa was stopped by Dunderdale, who identified himself as a state trooper and told Figueroa to put his hands up. [Hearing Tr. at 15:16–16:5, 55:4–9; Footage].

At this time, Dunderdale noticed a large object in Figueroa's right front pocket. [Hearing Tr. at 56:9–58:14]. Dunderdale asked Figueroa, "Is that a gun?" and Figueroa confirmed that it was. [Arrest Report at 4; Hearing Tr. at 15:22–16:8, 56:9–58:14]. Dunderdale told Figueroa to

3

get on his knees and to put his hands behind his back. [Hearing Tr. at 58:6–14]. Figueroa complied, and Dunderdale removed the firearm and placed it on the SUV's roof. [Arrest Report at 4; Footage; Hearing Tr. at 15:16–16:5, 58:13–16, 59:11–16]. When Dunderdale asked Figueroa if he had a license for the weapon, he said that he did not. [Arrest Report at 4]. Dunderdale cleared the firearm, which had one round in the chamber and five in the magazine. [Id.].

The officers then transported Figueroa for booking. [Id.]. During the drive, Figueroa told the officers that he was a high-ranking member of the Latin Kings and that he was in violation of federal probation out of Rhode Island. [Id. at 4–5].

## II. DISCUSSION

The Fourth Amendment of the Constitution protects citizens against unreasonable searches and seizures. U.S. Const. amend. IV. If, however, an officer observes unusual conduct which leads him to believe that a suspect may be engaging in criminal activity and may be armed and dangerous, "he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discovery weapons which might be used to assault him." Terry v. Ohio, 392 U.S. 1, 30–31 (1968).

The parties agree that there was an investigatory stop that began when Dunderdale identified himself as a state trooper and told Figueroa, who was exiting the SUV, to stop, but disagree as to whether the investigatory stop was reasonable. [Hearing Tr. at 70:24–71:17]. "[I]n reviewing the reasonableness of a Terry stop, the court must first consider whether the officer's action was justified at its inception; and, second, whether the action taken was reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Stanley, 915 F.2d 54, 55 (1st Cir. 1990) (citing United States v. Sharpe,

4

470 U.S. 675, 682 (1985)). In determining whether the officer's actions were justified, the Court must consider the circumstances as a whole. United States v. Trullo, 809 F.2d 108, 111 (1st Cir.).[3]

### A. The Stop Was Justified at Its Inception

In order for a Terry stop to be reasonable, the stop must be justified at its inception. United States v. Smith, No. 13-cr-10064, 2013 WL 6072876, at *3 (D. Mass. Nov. 13, 2013) (citing United States v. Maguire, 359 F.3d 71, 76 (1st Cir. 2004)). A stop is justified at its inception when the officer has a "reasonable, articulable suspicion that criminal activity" is taking place. United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004).

The Court finds that the stop at issue was reasonable at its inception. The officers were patrolling a high crime area that had experienced an increase in drug trafficking activity, including a prior controlled buy in a nearby parking lot. [Hearing Tr. at 52:6–19]. Although Figueroa's presence in that high crime area would be insufficient on its own to justify the stop, United States v. Am, 564 F.3d 25, 30 (1st Cir. 2009) ("[L]ocation on its own is insufficient to create reasonable suspicion . . . ."), officers are permitted to consider the location of the suspicious activity when determining whether a Terry stop is appropriate, see United States v. Ruidiaz, 529 F.3d 25, 30 (1st Cir. 2008); see also Illinois v. Wardlow, 528 U.S. 119, 124 (2000)

---

[3] The government argued during the motion hearing that the firearm recovered from Figueroa would also be admissible pursuant to the inevitable discovery doctrine. "Under the inevitable discovery doctrine, unlawfully obtained evidence that 'inevitably would have been discovered by lawful means' is admissible." United States v. Siciliano, 578 F.3d 61, 68 n.4 (1st Cir. 2009) (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)). The government argues that even if the officers had only asked Figueroa for his identification, they would have run his name, learned that he was in violation of probation, arrested him, and found the firearm incident to the arrest. [Hearing Tr. at 69:1–12]. Figueroa argues that even if the officers had only asked for his identification, it still would have been a stop and therefore subject to a reasonableness determination. [Id. at 77:25–78:17]. Because the Court finds that the search was part of a lawful Terry stop, it does not reach the issue of inevitable discovery.

5

("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a Terry analysis.").

In addition to the significance of the location, both the passenger and Figueroa appeared anxious. Figueroa repeatedly entered and exited the Country Farms convenience store without purchasing anything. Meanwhile, the passenger was pacing on the porch in a way that made the officers believe that he was nervous. Although this nervousness on its own would also be insufficient to justify the stop, United States v. McKoy, 428 F.3d 38, 40–41 (1st Cir. 2005), the Supreme Court has "recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," Wardlow, 528 U.S. at 124. Here, it does not seem that Figueroa's nervousness was in reaction to police presence. See McKoy, 428 F.3d at 40 ("Nervousness is a common and entirely natural reaction to police presence . . . ."). Rather, the officers perceived Figueroa as being nervous while he was waiting for the driver and passenger to return to the Country Farms parking lot from the nearby house, before he saw that the officers were in the vicinity.

Additionally, the officers witnessed the driver and passenger leave the Country Farms parking lot independently before meeting once again at a nearby house and then returning to the parking lot to meet Figueroa. The passenger, driver, and Figueroa all entered the SUV without acknowledging each other and then talked in the vehicle without leaving the parking lot. This pattern of behavior led the officers to suspect, based on the totality of the circumstances, that Figueroa, the driver, and the passenger were engaged in drug-related activity inside the vehicle. When the officers approached the SUV and opened their doors, Figueroa immediately left the

6

vehicle, but was intercepted by Dunderdale. The Court finds that, looking at the circumstances as a whole, Figueroa's activity, informed by the officers' previous observations, was sufficient to justify the search at its inception.

### B. The Search Was Reasonably Related to the Officers' Justifications in Scope

The Court also finds that the search was reasonable in its scope. "[T]he reasonable suspicion that permitted the police to stop [Figueroa] does not automatically give police the authority to frisk him attendant to that search." Am, 564 F.3d at 32. When Dunderdale stopped Figueroa as he was exiting the SUV, he saw that Figueroa had an object in his right front pocket. When Dunderdale asked Figueroa if the object was a gun, he said that it was. Dunderdale therefore acted under the reasonable, confirmed, suspicion that Figueroa had a weapon. See United States v. Scott, 270 F.3d 30, 41 (1st Cir. 2001) ("A police officer may frisk a suspect—that is, search the suspect's person for weapons—on reasonable suspicion that the suspect is armed and dangerous.").

### III. CONCLUSION

Accordingly, for the reasons stated herein, Figueroa's motion to suppress [ECF No. 78] is DENIED.

**SO ORDERED.**

November 5, 2019                /s/ Allison D. Burroughs
                                                  ALLISON D. BURROUGHS
                                                  U.S. DISTRICT JUDGE